May it please the court. My name is Jim Jellison. I represent Pinal County Sheriff's Sergeants Skedell and Lepre, and City of Casa Grande Sergeants Ragg and Engstrom, and City of Casa Grande Police Officer Robinson. I'm going to endeavor to reserve three minutes for rebuttal, and we'll see how that goes. This is a case, interestingly enough, where we're not starting from scratch. It was probably a year ago, and it was my last live Ninth Circuit oral argument that I addressed this case originally with the Ninth Circuit. And Judge Murguia, I agree with you. I miss being there live. But at that time, we were really appealing the same thing, the denial of qualified immunity from a motion to dismiss, and the resolution of the Ninth Circuit panel at that time was to send the case back to the district judge in order to do a very specific thing, and that is- Counsel, forgive me for interrupting, but we're very familiar with the facts and the procedural history of the case. So in your best interest, you might want to move to it. Go to it. Well, I think, Your Honor, you know, this case, it's basic facts sort of take me back to the Ninth Circuit's decision in Boyd v. Benton that talks about the idea that police officers can use less than lethal alternatives in order to breach and enter property because it's intended to avoid unnecessary personal harm or personal fatalities. And so we're dealing with, when we deal with an excessive force on property case, we're dealing with something different than an excessive force on people case. Absolutely. And the law is very clear about the importance of making sure that police officers, when we look at reasonableness in this context, we're very concerned about officers not being required to put themselves in positions where they're going to be harmed. No question about that. Could I ask some questions about this timeline? I have a pretty detailed timeline. It's a very interesting and disturbing case. And I'm just want to say, we are really mindful that we have this benefit of 20-20 hindsight. That's the nature of our job. That said, the complaint alleges that the search warrant was obtained at five o'clock. Is that right? That's correct. What happened before five o'clock? What actions did the officers take before five o'clock? We understand that they had reason to believe this domestic violence suspect was in there. We know that. So, and we also know that they did not have reason to think that he was armed with deadly force. But I understand that domestic violence suspects can be very, very dangerous. What happened before five o'clock, before they had the search warrant? So my understanding on the allegations and really to me, they're not exactly clear, but at 321, Horne requested SWAT assistance. At 421, the SWAT teams arrived and began evaluating the scene and the subject residence. And then at five o'clock, the judge signs the search warrant. I don't know that the complaint is entirely clear that the after or before the five o'clock timeframe to run over the fence and breach the windows. But that being said, I also don't read the plaintiff or the plaintiff's brief to, or their complaint to allege that the police officers were there unlawfully, merely that the force that they used was excessive. Okay. It's pretty profound force, this Bearcat. And I think that the complaint does allege that that was used prior to the time the search warrant was obtained. Going back to the procedural posture, I think there were originally something like 16 or 17 defendants now on our panel, a different panel, but our court suggested we need to know exactly what, who did what, and so now we're whittled down to, I think, five defendants. Is that right? That's correct. Okay. And all five of those people were on the scene, unlike some of the other 12 and they all went in the home. You have to sort of pick through the complaint, but I think it's alleged that they all went in. Is that right? No, I disagree with that, Your Honor. I don't think there's any non-conclusory allegations that these five people entered the home with one exception, and that would be Sergeant Engstrom. Well, there's allegations that I agree that you have to pick through. Let me ask a better question if I could, so you can fairly respond. I think the allegation is between the Bearcat and the tear gas and the flash bangs, that a whole lot of damage was done to this home, regretfully, after the fact we now know the suspect wasn't there, but I think what they're alleging is that from what they know at the 12B6 level, right out of the gate, so they don't probably know much at this point, that all five of the remaining defendants either went in and violated the Fourth Amendment because they went in, all this damage occurred, or that they were present and failed to intervene. Is that a fair statement? Do I understand that part correctly? I disagree with that, Your Honor. And I go to the non-conclusory allegations of the complaint. In other words, there are conclusory allegations that would suggest anybody and everybody went into the home, but the only fact allegation that we can rely on appears at ER 87, this is the complaint at paragraph 126, that only Sergeant Engstrom is identified as being, quote-unquote, part of the tactical team that entered the main home. There's no non-conclusory allegation that Skadel, LaPree, Greg, or Robinson ever entered the home. Engstrom is the only one. There are allegations for each one of them, but I don't want to take a lot of your time, that folks either entered or stood by as, and, you know, maybe provided cover while the other five, other members of this cohort, lobbed in tear gas and flash bangs and whatnot. In other words, that all five were right there. Do I misunderstand that? Well, I've gone through this in some detail. Yeah. And I think what we're asking the court to do is what the Supreme Court in Edmonds is asking the court to do is look at the actions of each person that are alleged correctly, look at the circumstances under which they engaged in those actions, and then ask, does that violate clearly established law? So if Sergeant Skadel, for example, uses two NFDDs or, you know, commonly referred to as flash bang devices, is there clearly established law that tells him that he can't do that after they've determined from the robots that there's not innocent people? Nobody's claimed to have been injured. No fires claimed to have been started. And there is no clearly established law that tells him he can't do that. Let me ask you this, because I think you may well prevail at the summary judgment stage. I just have one more question for you. And, you know, this is at the 12 v six stage. So we have to be very mindful of that as well. And this, I'm going to call it a siege. I don't mean to be dramatic in that, but the standoff lasted something like six or seven hours. So there are other cases where we said, for example, you can tase somebody under certain circumstances, three, four or five times, and when it gets to be a 20 or 22, is there an issue of fact about whether that was excessive when we have said yes? There are courts that have done that. So, given that we're at the 12 v six and there's this very prolonged period of force that's used, is it your position really that there is no point at which this became excessive after the robots had failed to yield any indication anybody was in there and whatnot, what's your best response to that? Please. My real response is that the actions alleged don't violate clearly established law. And if you look at the appellee's brief, they don't provide that clearly established law. And I, you know, I go back to this court's own decision in West versus Caldwell in 2019, and, you know, we talk about LaPrey using 22 canisters. Well, how did MENA not provide, before you get to Wes, how did MENA not provide your clients with fair warning that the damage they allegedly caused violated the fourth amendment? Well, again, this court looked at MENA and found that the specific facts of that case is that there were comments that damaging property was cool. And in West, the court says plaintiff does not claim and the record does not suggest the defendants damaged your house because they thought doing so was cool. Moreover, MENA simply does not, and I'm quoting from West, MENA simply does not describe an acceptable amount of property damage that a SWAT team may inflict while trying to flush a violent and likely armed felon who recently had threatened a police officer's life out of the house. Exactly. West is really different circumstance where somebody was armed and this person was known to have tried to drive a car over some police officers. And so the context is really entirely different, isn't it? I disagree. In West, the arming was a BB gun, which for equipped officers, I suppose- I'm not sure an officer should be expected to face down a BB gun or anything else that can blind him, certainly. That person was known to be armed and very violent and dangerous. We don't have that here, do we? I think we do. I think that the allegations of the claim say that this, that Mr. Ochoa was wanted. He was described as having something that I don't fully understand. And that is a stun gun in the form of brass knuckles. I don't know what that is, but the police shouldn't be expected to assume. But he had two prior theft arrests or pickups for theft. He had this stun gun in the form of brass knuckles. And then I think there was also a prior incident of domestic violence. You're going to compare that to the same person in West that had, was a violent offender. I mean, had demonstrated violence very, quite clearly, and had a very clear evidence of domestic violence. I mean, I think that's the question that you're being asked. Is that a fair comparison? I think that there's, first of all, we don't have to show the clearly established law, the other side has to show the clearly established law. But I think that there is a remarkable comparison. There was a domestic violence situation. It was threatening with a BB gun. They believed the person was in the house, but that person that they were looking for wasn't in the house. And they used tear gas, which kept the property owner out of the house for three months. I mean, it was as grave. And again, the Ninth Circuit says, you know, we found no Supreme Court or Ninth Circuit case that clearly establishes that the procedure defendants followed, including the use of tear gas, and the resulting destruction is unreasonable under these circumstances. If they couldn't find that law in 2019, we know that that law didn't exist in 2014. So if there's not a law that- That is another question I had. Can we consider West here since it was issued in 2019 and plaintiff's house was searched in 2014? I think that you wouldn't be able to consider West as something that would inform the officers of what they could or couldn't do in 2014, but what you can use West for, because it occurred after the fact, is what I just said. If there's not clearly established law in 2019, then there wasn't clearly established law in 2014 regarding the use of flashbangs under these circumstances, or the use of tear gas under these circumstances. And so I know I'm sub three minutes. Yeah. Judge Lefkoe, I think you had a question. I- What was my question now? Okay. Oh, I know what I was going to say. This whole notion of qualified immunity saying there's no established law prevents the development of the law and, you know, because unless the, unless the case like the one we're discussing here, which the name of it, I forget. But anyway, unless that becomes precedent that it was a constitutional violation, but there's, they're entitled to qualified immunity, you're just saying that really that they can do just about anything that's as outrageous as they want to be, as long as nobody else has done it. So what is your, when would something become so unreasonable that it would be obvious that it was unconstitutional in the context of this? Well, the ninth circuit, the ninth circuit in the sharp case says we quote, quoting it, we examine whether the violative nature of particular conduct is clearly established by controlling precedent, not whether the conduct violates a general principle of law, except in the rare case of an obvious instance of constitutional misconduct, plaintiffs must identify a case where an officer acting under similar circumstances as defendants was held to have violated the fourth amendment. And yes, your honor, I agree. That's a strict standard, but I, I'm not making it up. It's what the Supreme court is telling us to do in cases like Emmons and, and as far back as Anderson versus Creighton, the Supreme court has told us that plaintiffs are not entitled to discovery until they've crossed that hurdle of establishing that qualified immunity and the entitlement to it doesn't apply because there's a violation of clearly established law. Um, you know, so all I'm asking the court to do is, is follow Emmons, follow Kosella, and, and do what the Supreme court has asked us to do so that we're not, you know, being beaten back by the Supreme court on a regular basis, uh, for not doing what they've asked us to do in assessing qualified immunity. But Judge McKay, may I ask one more question before we turn? Uh, the other thing alleged, we've, we've talked a lot about the amount of force that was used, um, on the outside, as opposed to, um, the other theory that's advanced in the complaint, which is that once the officers were inside, that there had been, may have been unnecessary destruction because of course, the search warrant was to authorize, uh, to arrest this individual. Um, who wound up not being inside very tragically. Uh, but, um, the allegation is that there were places within the home that were, um, and objects that were destroyed that were entirely too small to, for, for a person to hide in, um, including objects that don't strike me to be subject to destruction by a flash bang, you know, soft items, pillows, uh, ripped apart and whatnot, you know, the allegations are obviously very well prepared today. Uh, can you tell me about that? Is it your contention that officers would not have known that that, um, uh, exceeds the scope of the, uh, of what the fourth amendment allows? And I appreciate that question, Your Honor, because what it tells me is that the court recognizes that for the differing types of force, bear cat, flash bangs, tear gas, and, and conduct inside the home, there's a different analysis that needs to be brought to bear under clearly established law. Uh, on that aspect of the case, again, that's, that's where I'm, I go more towards, towards the allegations of the complaint that Skadel, LaPree, Gregg, and Robinson really aren't alleged to have gone in there in order to, to possibly have unnecessarily damaged things. Certainly things might've been damaged by, you know, the other uses of forces, uh, uses of force, excuse me, but only Engstrom is, is, is, is, uh, specifically identified as a person who was on the entering tactical team. And again, I, I go back to West, uh, because West, you know, indicates that that alone, you know, the fact that property was destroyed alone without allegations, that there was some, you know, malicious, unnecessary intent to it as there was in MENA doesn't, doesn't cut it. And so- At what stage was, uh, was West decided? At what, I think West was, was a summary judgment, uh, was at the summary judgment stage. Right. Um, so- I think that's right. And, um, hence my earlier questions. I appreciate your response and Judge McGee, I appreciate you letting me go over time. Thank you. Sure. Of course. And I'll give you a couple of minutes for rebuttal, Mr. Jellison, but I'll call upon Mr. Woods right now. Thank you, Your Honor. Thank you, Your Honors. May it please the court. Uh, I'm Sean Woods of Mills and Woods Law, and I represent Denby, uh, and the related plaintiffs in the underlying case. And I think that from a, just, just from a very basic standpoint, uh, first of all, district court judge did do an individualized analysis on each of the named defendants that are remaining. Uh, and I could point you to, uh, in the record, again, our, our second amended complaint, paragraph 152 sort of wraps that up and says that Lapre, Engstrom, Skadel, Gregg, and Robinson separately and in concert engaged in illegal conduct. And I know that that is a conclusory in our account, but we've laid out everything that each one of them did. And I think Mr. Jellison was incorrect on, on, on the specific allegations, because we do say in the complaint as well, that Skadel during the breach of the SWAT team, um, launched an additional two flashbang devices, but back to the, um, the clearly established law. But before you get into the substance of clearly established law, um, because you do mention that multiple times, uh, in your briefs that you've not had ample opportunity or opportunity to conduct discovery, um, but I'm just curious. Did you ever file a motion to compel limited discovery in the district court? In the district court, we've been in the motion to dismiss stage for, for years now, and we did request limited discovery. And at one point limited discovery was ordered by the, by the district court. Um, but then another appeal, interlocutory appeal came down and stayed the action. Counsel, I've looked for that order. Do you have a indication? Where, where do I find that? Was it an oral order? Um, because your brief makes mention to not having received discovery you're entitled to. I think it says that the court ordered. Where, where is that order? Okay. Um, off the top of my head, I do not know, but I know it exists. I can submit an additional document if the court so. I think it's an important point and it's not in your briefing. I can't find it on the docket. So if I've overlooked it, um, I've overlooked it, but I just need some help. Your position today for purposes of argument, your position today is that the court ordered discovery and you didn't, haven't received it? That no, we weren't able to actually proceed with it after the order because of the interlocutory appeals. So the answer is yes. You just said no. The answer is yes. The court ordered discovery and you haven't. Correct. Okay. Thank you. Um, I'm sorry. Go ahead. So in terms of the clearly established rights and the violations, I, I think that this, your honors are correct. That MENA is the controlling case and is the case that we rely upon heavily only because it describes very specific events that were not, um, reasonable for the officers to undertake, including- Opposing counsel makes a strong point that that case is also distinguishable, uh, because there's this outrageous comment by an officer that he thinks it's cool to kick indoors. Right. What's your best response to that? Well, my best response to that is that we don't have the full, the full record to be able to use that point in the sense of these guys were hyped up and ready to attack this house. What I can say is that the complete, unreasonable, excessive force that was used inside the house puts this squarely in the MENA context. How do we know any of the force was actually exercised once the officers were in the home? Beds were flipped. A toilet was smashed. Um, So, so for example, uh, we've seen the photos that that's in the record. Um, how do I know that was the result of forced use once the officers were in the home, as opposed to a flashbang being lobbed inside, you know, with a concussive force, how do I know that? Do I know that at this point? Yeah, you do know that. And if you look at the photographs, there are some photographs, including a TV that had been hit with one of the canisters that was fired, and you can see the damage to the TV. You can see the, the, the cylinder- came in the house, as opposed to, I think every window in the house was broken eventually. So how do I know that? I've seen the photo you're talking about. How do I know that canister didn't come through a window and hit the TV? Maybe I'm not eloquently stating the point. Um, that is clearly from one of the canisters that had been fired from outside. And, and so you can tell impact points on the walls and on. So I'm asking a different question. My question, and I guess I wasn't clear. My question is how do I know what damage or whether any damage was inflicted after the officers went in? And again, I would point back to the pictures of the flipped over beds. Um, the flashbangs aren't going to flip the beds over. There are cabinetry and shelving units that were shoved aside. Um, and, and again, the, the toilet, I mean, I go back to the toilet because it's a sad story. Um, but that toilet was demolished and then water damage covered the house. Uh, but let me ask, let me follow up on that. I I'm trying to understand. So is your, uh, are your allegations that, uh, the, the, the actions, uh, that resulted both as they were entering, like the use of the bearcat, um, uh, the, I didn't know how to read exactly your allegations. Is it, you know, I think they said there were 22, um, canisters that were thrown into the house, uh, I mean, it seems like you were trying to say that was excessive, but we're also looking at the damage in the house. I mean, I mean, if you throw 22 canisters in the house, are you not going to get the kind of, uh, damage that resulted is reflected in those pictures or was that, was there additional officer conduct that contributed? I think that's the question that Judge Kristen's asking. Okay. Thank you for the clarification. Yes. Uh, you know, the, the, the totality of the circumstances, including the bearcat prior to entering the house, including the firing of the flashbang device prior to entering the house, um, and including the 22 canisters that were shot into a 1200 square foot area, all of that contributed to the damage and was all unreasonable and excessive. Whether or not the canisters themselves caused any damage inside, there is canister, as you can see in the photos, hitting a, hitting a TV and hitting the walls, there is extensive damage, including, uh, the beds being overturned. The, the, the, the shelving units destroyed, like I said earlier. Um, so I think you look at it as the totality that they were unreasonable from, from the get go. And in fact, I think that the best argument here is as soon as they saw movement under that tarp, it should have been investigated instead of laying siege for the next seven hours and not having any contact with Ochoa. And is there another case besides MENA that supports your argument? Yeah, I think both Boyd and, um, US versus Anchorage does. Um, I also think that if you look at, uh, let me just get there. I apologize. I think if you look at Graham, if you look at... Well, what, tell me about what those cases tell. That's the most compelling that, you know, best supports your argument. So, so those cases give us guidelines on how to determine whether or not, um, how to evaluate the reasonableness of the officer's actions, uh, in Graham, you know, you look at the severity of the crime at issue, you look at whether a suspect poses an immediate threat to officers. You look at whether the suspect actively resists detention or attempts to escape. And it boils down to, uh, the, the objective reasonableness analysis, which is the force which was applied must be balanced against the need for that force. It's the need for the force, which is at the heart of those factors. And are they sufficiently similar to squarely address what happened here? Yeah, again, MENA, MENA is the number one for that. Um, but also Liston versus County of Riverside is similar. Uh, West is even sort of similar, this 2019 case that obviously was not clearly established at the time, except for the fact that the, the, the person in West, uh, the suspect in West was extremely violent, known to be violent and, uh, had, had other factors, including methamphetamine usage and previously trying to attack. How does West help you? I'm not quite sure how West helps you because it's specifically distinguishes MENA or tries to, apparently. I don't think West is, is, is even applicable here, but West describes what, um, the officers did to a person that was extremely violent and was subject, was, was, was welcome to that property. This situation is, Mr. Danby owns a house. He's at the grocery store. He hears the police are sieging his house. In our case, we had, we had keys that were provided. We had the opportunity to go in. The front door was open. It was not locked. And then- But are you suggesting, you make, you, you mentioned that several times, forgive me for interrupting, but that, that point is important. Are you suggesting an officer was required to approach this door and let himself in through the front door, use a key, it strikes me as much more dangerous, uh, for an officer to have to expose himself in that way. That, that, that's not my suggestion. My suggestion is that they knew that the doors were open. So when they were to breach or even try to, to exercise the search warrant, they did not have to knock down the doors. They did not have to break through the windows. They could have entered the house. I mean, when you look at what happened, there were two robots that were sitting in the house, couldn't find the person inside the house. There was a PA system used for hours. He never responded. There was a scene where, or an instance where Officer Engstrom saw the tarp move, they didn't look into that. So then they did all of these extra things that were completely unnecessary to try to get Ochoa to leave the house. Well, not all of those things happen at the same time. This is a six, five or six hour period, something like that. So Hans, my question about, you know, at what point does it become unreasonable and, or if ever, and I can't tell from your briefing, whether your contention is the whole thing, including the use of the Bearcat from the outside was unreasonable or that at some point it became unreasonable and if, and if it's the latter, can you tell me at what, at what point was the force too much? As soon as the Bearcat ran over the fence, I believe that that is when the, the unreasonableness started. Because following that, following that is when they started launching the tear gas and the pepper spray. Okay. Wait a minute. So, so you said as soon as the Bearcat, so you think use of the Bearcat was an excessive force? I do. Okay. So what did they know at that point that made you, that the use of the Bearcat unreasonable, please? Um, there, there's, there was case law. And again, I think it's California case law. Um, but, uh, it talks about just, just per se, the use of a Bearcat being unreasonable. Because, um, I'd be really interested in any, anything that says that, that, that use of a Bearcat is per se unreasonable. And, and a follow-up question is the complaint clearly led is that at five o'clock, the warrant was signed. We don't have the warrant in our record. Um, was the Bearcat used before five o'clock or there was a warrant? It was. The SWAT team showed up and one of the first things they did, according to the facts that we have, uh, is, is deploy the Bearcat to run over the fence and open up the door and the windows.  And the key or more or less gave access to the house, right? That's right. So the argument is that there was no need for a Bearcat to get in. They could have taken precautions for their own safety without using a Bearcat. That's correct. Yeah. The Bearcat was per se excessive. And if you look to the Lankford case, the Lankford case discusses the, the, the Bearcat and the fact that it's used as a battering room and that is per se unreasonable in situations like this. Well, it's the situations like this where I think you get tripped up because it, it's really different if somebody is inside, known to be inside, known to be armed and so forth. I don't want to belabor the point, but it does seem to me to be very context specific. It is, it is, Your Honor. But in this case, um, we had a situation where we had a non-violent suspect, um, who on information and belief was in the, was in the home. And yes, Officer Engstrom says he saw him exit the home twice. Um, the house was completely surrounded by, by police officers and SWAT team. And for him to have exited the house and then go back in, but then somehow get out of the house and hide under this tarp, that, that would have been seen by the complete, I mean, there was a complete canvas around the house and officers looking at every entry point. Um, so it goes, it boils down and this is, this is where the fact discovery I think is necessary in that did, did Officer Engstrom really see him leave the house and go back in or, or what did he actually see? And he did notice the tarp moving at three o'clock in, in the three o'clock hour and never, and nobody investigated it. They said that there was a loose dog in the area and that the tarp... We know those facts. It's your argument. We know those facts, forgive me for interrupting, but, but can you tell me what, what is the import of that? You think this use of force was unreasonable because they didn't first check under the tarp or what are you telling us, please? Absolutely. They had it, they had an indicia that, that there was something moving under that tarp and ultimately that's exactly where they found Mr. Ochoa. Right. Do you know what these brass knuckles were? It's a very odd description of what he was armed with. And I'm with opposing counsel. I don't know what that thing is. Do you know? I've been racking my brain since I got this case. I have no idea what that is. And I know, and I believe that they were not found on his person. Okay. So we're unanimous on that point. We have something we can agree upon today. All of us. Thank you. Thank you, your honors. I have nothing further. So I have nothing further. Okay. Mr. Jellison, I'll give you two minutes. I'll give you two minutes. Thank you. I appreciate that, your honor. The issue of discovery came up and, and, you know, originally the district court denied qualified immunity on the basis that more discovery needed to be done. That's what went to the ninth circuit originally. And this, this court held that, no, you need to decide qualified immunity using the clearly established law standard before discovery happens. So that's an issue that's already been decided by this court and put to rest. And it's original order. So counsel, can I just, forgive me, but opposing counsel said the court ordered discovery. Is this the same order you're talking about? There's no outstanding order permitting discovery. Yeah, I don't, I don't believe so. I think that once qualified immunity was raised, stays were requested and were either stipulated to or granted. Okay. Thank you. But this court has already decided we need to decide qualified immunity before there's discovery. I want to say something about MENA. MENA doesn't cover Bearcat use, tear gas, or flashbangs. And in fact, the Langford case, the only case that's cited on the Bearcat is a California Supreme court case, not US Supreme court, not ninth circuit, not consensus of court of appeals and where a Bearcat was used in a far different way than was here. But MENA does not enlighten us one iota on use of Bearcat, tear gas, or NFPDs. What's the case we should look at about the allegation that use of Bearcat is per se unreasonable? What's that case? That's not a Langford case. It's a California Supreme case. I've read Langford. If that's what we're talking about, I've read Langford. Okay. Thank you. That's as far as I went. And then I want to say something about tactics and that's why clearly established law exists. Tactics aren't what we decide or even what we think a jury is going to look at in terms of what's reasonable or not. Officers can use tactics that don't violate clearly established law. Boyd, Ankeny, Graham, MENA don't apply to this case and therefore don't apply to clearly established law that says that these tactics couldn't be employed by these officers. And I see I'm out of time and I appreciate my two minutes. Let me see if Judge Lefkoe, do you have any questions before I conclude? No more. Okay. Judge Christin? Nothing. Thank you. All right. Mr. Woods, Mr. Jellison, thank you both very much for your oral argument presentation in this very, very interesting case. The case of Denvey versus Engstrom is now submitted. That concludes our docket for today and we will be adjourned. Thank you. Thank you, Your Honors. This court for this session stands adjourned.
judges: Murguia, Christen, Lefkow